IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

TONY A. BERGER,

                Plaintiff,                    OPINION AND ORDER

v.

                                              21-cv-454-wmc

WOOD COUNTY SHERIFFS
DEPARTMENT, BRANDON
CHRISTANSON, and ERIC
MARTEN,

                Defendants.

*Pro se* plaintiff Tony A. Berger has filed suit under 42 U.S.C. § 1983, claiming that Wood County Deputy Sheriffs Brandon Christianson and Eric Marten unlawfully seized and arrested him, then searched his home and seized a firearm, all in violation of his constitutional rights.[1]  Before the court are the parties' cross motions for summary judgment.  (Dkt. ##23, 39.)  For the following reasons, the court will rule on both in defendants' favor.

UNDISPUTED FACTS[2]

**A. Background**

On May 1, 2020, at approximately 9:21 p.m., Brandon Christianson and Eric Marten,

---

[1] Berger also alleged malicious prosecution against a Wood County Assistant District Attorney that prosecuted him, but the court dismissed that defendant and the District Attorney's Office in a prior order.  (Dkt. #12.)

[2] The court has drawn these facts from the parties' proposed findings of fact and responses, as well as the underlying evidence, including body camera footage, as appropriate.  Berger did not follow the court's procedures by submitting numbered responses to each of defendants' proposed findings of fact as instructed in the court's preliminary pretrial packet.  Although he has filed a motion, his own proposed findings, a response brief, and exhibits, all of which give his side of the story, the court has no choice but to deem defendants' proposed findings of fact largely undisputed where Berger has not responded at all in some form or at least submitted admissible evidence in dispute of those findings. Thus, unless otherwise indicated, these facts are material and undisputed.

along with two other officers from the Wood County Sheriff's Department, responded to a call reporting that Berger had threatened to harm two individuals, then left in his truck with a gun and two clips.[3] These four officers, plus officers from several, other local police departments, proceeded to set up a safe perimeter around Berger's home, at which point Deputy Christianson called Berger's cell phone. At approximately 9:41 p.m., Berger answered. Christianson's body camera video footage captured that call, as well as his subsequent interaction with Berger, Berger's then-girlfriend Rebecca Mohr ("Mohr") and her minor son ("R.H.M.").[4] (Dkt. #48 at 2, Exhibit 1B.)

B. Officer Christianson's Interview with Berger

On the phone, Berger began by explaining to Deputy Christianson that his "girlfriend blew up" and had "a gasket," but he was now in his own house and alone, and everything was fine. (*Id.* at 13:23-14:17.) Noting the serious nature of the original call received by police, and wanting to get "both sides of the story," Christianson next asked to meet with Berger. In

---

[3] The two other officers submitted declarations in support of defendants' summary judgment motion, which generally corroborate defendants' account of the events on May 1, 2020, as well as attest to their having taken Berger to the hospital for a blood draw after his arrest. (Dkt. ##42, 47.) Defense counsel also submitted an affidavit attesting to reviewing and delivering video and audio exhibits on a thumb drive, along with copies of court minutes from Berger's preliminary hearing. (Dkt. #46.) While Berger does not dispute the authenticity of any of these materials, he nevertheless objects in his response brief to the declarations, arguing that the officers are acting as undisclosed expert witnesses. (Dkt. #51 at 1-3.) Berger's objections carry no water because these declarations neither change the outcome of the pending summary judgment motions nor constitute expert opinion; rather, each of these individuals simply attest to their firsthand knowledge of some aspect of the case. Berger also suggests that he be allowed to amend his complaint to add both officers as defendants, but has not filed a motion to do so. Even assuming it was not too late to add defendants Berger could have discovered before now, adding the officers now would be futile as they would be entitled to summary judgment for the same reasons as Christianson and Marten. *See Campania Mgmt. Co. v. Rooks, Pitts & Poust*, 290 F.3d 843, 849 (7th Cir. 2002) (court may deny a proposed amendment if the amendment is futile).

[4] Defense counsel also reviewed portions of Christianson's and Marten's body camera footage with Berger at his deposition. (Dkt. #38 at 16, 83.)

2

response, Berger repeatedly agreed to come outside, but said he had been drinking and was now in bed, so he had to get dressed first. (*Id.* at 14:18-15:56.) Finally, Berger agreed to exit his home with his hands up at Christianson's direction, saying it was "not a problem" and inviting police "to come on over." (*Id.* at 15:50-15:56, 17:10-17:12.)

Once Berger was outside, Deputy Christianson approached him in the driveway, where Deputy Marten was also located. At that point, Christianson specifically explained to Berger that police had received a call indicating that Berger wanted to take a gun to Rome, Wisconsin, and harm some people there. (*Id.* at 20:19-20:29.) In response, Berger admitted he was angry with a couple in Rome that Mohr had befriended. (*Id.* at 20:30-20:41.) Berger also said he had been at home that evening with Mohr and R.H.M., and that Mohr and he had "gotten into it." (*Id.* at 21:03-22:33.) Berger also stated that the individuals in Rome had threatened him, in response to which he threatened to go to Rome and "kick their ass." (*Id.* at 22:50-23:05.) At that point, Deputy Christianson asked Berger point blank why Mohr and R.H.M. had gotten so scared, and Berger explained that after their disagreement, Mohr had kicked him in the face when he tried to kiss her, so he had "shoved her back on the couch." (*Id.* at 23:28-23:57.) However, Berger denied going out to his truck with a gun; instead, Berger claimed he merely started his truck to leave, but then decided not to drive because he had been drinking. (*Id.* at 23:28-23:57.) Berger also stated that Mohr and R.H.M. had lived with him for almost five years. (*Id.* at 26:54-27:12.) In response to Christianson's follow up question asking whether there were any guns inside, Berger invited the officers into his home by stating "let's go in." (*Id.* at 28:20-28:31.) As Berger and the officers approached the home, Berger also remarked that he had guns, as well as 5,000 rounds of ammunition. (*Id.* at 28:35-29:01.)

Once inside, Christianson began interviewing Berger in his living room. Berger repeated that Mohr had been sitting on the couch, but when Berger tried to kiss her, she kicked him "right in the face." (*Id.* at 30:05-30:34.) At that time, Berger said, Mohr's son was in a nearby bedroom, then he led Christianson down a hallway, turning on a light in that bedroom. (*Id.* at 30:35-30:48.) Continuing down the hallway, Berger offered to show Christianson where he kept his guns. As Berger was stepping into a back bedroom where his guns were, however, Christianson said that he would like Berger to finish talking to him in the living room first, and they returned there. (*Id.* at 30:49-32:19.)

Christianson then asked Berger to continue telling him what happened with his girlfriend. Berger stated that after she kicked him, he "slammed her back against the pillow." (*Id.* at 32:20-32:33.) Afterward Mohr contacted the couple from Rome, who called Berger and threatened him, in response to which Berger acknowledged he threatened to "kick their ass." (*Id.* at 32:33-33:15.) Berger also recalled warning Mohr that if the individuals from Rome came to his home, he would "put a bullet in them," because he will give them "a war" if they wanted one. (*Id.* at 33:52-34:14.) Over the phone, Berger further told one of the individuals from Rome that he would "meet [him] anywhere" and show him "what an ass kicking is." (*Id.* at 34:53-35:06.)

Berger next admitted to Christianson that he "can be very mean," and that Mohr and R.H.M. were likely fearful he would kill one of the individuals from Rome if they came to Berger's home. (*Id.* at 35:17-35:43.) Berger also repeated that he "slammed [his girlfriend] back" after she kicked him, and said that if the officers "want to arrest [him] for that, alright." (*Id.* at 36:36-36:46.) Still, Berger denied choking his girlfriend, stating that he had instead "pushed" her head back and told her to stop kicking him in the face. (*Id.* at 36:50-36:58.)

4

Finally, although acknowledging that he drank, Berger said he does not "make stupid mistakes," and he again denied taking a gun out to his truck that night. (*Id.* at 36:59-37:31.)

### C. Christianson's Interviews with Mohr and R.H.M.

At that point, Christianson left the house to speak with Mohr, who was in the back of a squad car with her son R.H.M. After identifying herself, Mohr told the officer that Berger and she had "a couple of cocktails," then began arguing. (*Id.* at 43:22-44:57.) Next, she reported that Berger had choked her, called her names and broken a lamp; she had also heard him loading a gun in the bedroom, while threatening one of the individuals from Rome. (*Id.* at 45:12-46:57.) She further recalled that Berger choked her hard enough to impede her breathing, to feel like her eyes were rolling back in her head, and to think that she was going to pass out.[5] (*Id.* at 48:45-49:40.) Mohr also knew the gun that Berger had loaded was a pistol because after coming out of the bedroom, he put it down in the kitchen to put his boots on to leave. (*Id.* at 46:58-47:11.) At that point, Mohr said she fled the house with her son. (*Id.* at 47:12-47:53.)

While Christianson spoke with Mohr, Marten spoke with her son. Marten's body camera video footage captured that interview. (Dkt. #44 at 2, Exhibit A.) R.H.M said that he was playing video games when he heard Berger and Mohr yelling at each other. (*Id.* at 0:12-0:34.) He stepped out of his room and saw Berger on top of Mohr, choking her. (*Id.* at 0:35-0:41.) When R.H.M. asked Berger what he was doing, however, he said Berger "backed off" of Mohr. (*Id.* at 0:41-1:13.) At that point, R.H.M. recalled Berger went into the back bedroom, talked to the individuals in Rome, and threatened to go to their house and shoot

---

[5] There were no photographs taken of any "strangulation marks" on Mohr's neck, nor did she have any difficulty speaking during her subsequent encounter with police. (Dkt. #23-1 at 3.)

5

them. (*Id.* at 1:14-1:52.) After leaving the house with his mother, R.H.M. said that Berger came out with a specific silver and black pistol and started his truck. (*Id.* at 2:48-4:35.)

### D. Berger's Arrest and the Search of Berger's Home

Following the officers' interviews of R.H.M. and Mohr, Deputy Christianson walked back toward the house, where Berger was standing outside. (Dkt. #48 at 2, Exhibit 1B at 58:15.) Christianson explained that based on their version of events, he would be arresting Berger for strangulation and being armed while intoxicated. (*Id.* at 58:17-60:00.) As he was handcuffed, Berger told the officers that he did not blame them for what was happening; rather, he blamed Mohr. (*Id.* at 61:19-61:50.)

Once Christianson had placed Berger in the back of a vehicle, he returned to Mohr and R.H.M. (*Id.* at 65:25.) Christianson then asked Mohr whether she could access the guns, to which she replied, "we can go look," and walked back to the house with the officers and R.H.M. (*Id.* at 65:30-67:09.) Once inside, Mohr indicated where Berger had set the gun in the kitchen, and R.H.M. went to the back bedroom. (*Id.* at 67:10-67:34.) Christianson and Mohr then followed R.H.M. to the back bedroom, where he pointed out the pistol and Christianson retrieved it, along with a holster and two clips. (*Id.* at 67:35-69:42.) Christianson then reviewed domestic abuse paperwork with Mohr, who chose to invoke the 72-hour no contact provision. (*Id.* at 70:50-90:35.)

Later that evening, Berger was booked into the Wood County Jail where a sergeant received several medications for him, including gabapentin, cyclobenzaprine, diclofenac, and naproxen. (Dkt. #52-3 at 8.) Moreover, Christianson signed a probable cause to arrest statement, which was approved by a Wood County Circuit Court judge on May 2, 2020.

6

(Dkt. ##48-2, 48-3.) Throughout their encounter with Berger, Marten, Christianson, and a nondefendant Wood County Sheriff's officer each attest that while Berger sounded intoxicated, he gave responsive answers to questions and did not appear to be impaired. (Dkt. ##42 at 2, 44 at 3, 48 at 3.)

### E. Berger's Prosecution

On May 19, 2020, Berger was charged with strangulation, disorderly conduct, and intoxicated use of a firearm, each with a domestic abuse enhancer. At the conclusion of Berger's preliminary hearing, the circuit court found probable cause to believe that he had committed a felony, and he was bound over for further proceedings. However, the state ultimately moved to dismiss the charges against Berger without prejudice in March 2021 because one of Mohr's sons was diagnosed with cancer, and she declined to cooperate with the prosecution or to make R.H.M. available. (Dkt. #52-4 at 4.) Berger's gun, holster, and two clips were then returned to him. (Dkt. #41-1.)

In support of his assertions of innocence in this lawsuit, Berger submitted an email that Mohr sent to Berger's criminal defense attorney after his arrest, which states that she did not give police permission to take her son into the back bedroom or to take the pistol, and she wanted the matter dismissed. (Dkt. #52-7.) Berger has also submitted Mohr's June 2, 2020, victim impact statement in which she again requests that the case be dismissed and states that she never gave police permission to question her son and that she would not testify for the state (*id.* at 2), as well as an affidavit from Mohr's brother purporting to attest that Mohr and R.H.M. had agreed to lie that Berger had choked her to have him arrested. (Dkt. #52-6.)

7

OPINION

Defendants seek summary judgment on all of plaintiff's claims.[6] A party is entitled to summary judgment if the movant shows that there is no genuine dispute as to any material fact, and judgment is appropriate as a matter of law. Federal Rule of Civil Procedure 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that "might affect the outcome of the suit." *Anderson*, 477 U.S. at 248. If the moving party makes a showing that the undisputed evidence establishes their entitlement to judgment beyond reasonable dispute, then to survive summary judgment, the non-moving party must provide contrary evidence "on which the jury could reasonably find for the nonmoving party." *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406-407 (7th Cir. 2009) (quoting *Anderson*, 477 U.S. at 252).

There is an additional qualifier in cases where, as here, video evidence is available: "to the extent [plaintiff's] story is 'blatantly contradicted' by the video such that no reasonable jury could believe it, we do not credit his version of events." *Dockery v. Blackburn*, 911 F.3d 458, 461 (7th Cir. 2018) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). Plaintiff does not dispute the contents of the body camera footage, but throughout his deposition and in his response to defendants' motion for summary judgment, plaintiff asserts that he was on medication, as well as drinking, suggesting that he was impaired. (*See* dkt. ##38, 51.) Even accepting that plaintiff was taking medications, his assertions are insufficient to create a genuine issue of material fact because he does not indicate when or what he told defendants about his medications during the encounter leading to his arrest, nor explain why defendants

---

[6] Defendants alternatively assert that they are entitled to qualified immunity as to any claim for monetary damages. (Dkt. #40 at 22-23.) Because they are entitled to summary judgment on the merits, the court will not reach that question.

should have realized he was too impaired to answer questions based on his behavior. Nor has plaintiff submitted any evidence establishing that his medications would have impaired his ability to recall events or respond to questions based on the amount of alcohol he had consumed that evening. If anything, it is further reason for a reasonable jury to question the accuracy of plaintiff's current recollections of what happened that evening. With this in mind, the court turns to plaintiff's claims against each named defendant.

**I. Wood County Sheriff's Department**

As an initial matter, defendant Wood County Sheriff's Department is entitled to summary judgment. Section 1983 allows a plaintiff to sue a "person" who violates his constitutional rights under color of state law, but a sheriff's department is not a person; nor is it a suable entity separate from the county government it serves. *Whiting v. Marathon County Sheriff's Dep't*, 382 F.3d 700, 704 (7th Cir. 2004). Under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 690 (1978), municipalities and other local governments may be liable for an employee's conduct if the employee injured the plaintiff in execution of an official policy, custom, or widespread practice.

However, plaintiff has not alleged any facts in the complaint regarding the policies or customs of Wood County nor its Sheriff's Department. Similarly, plaintiff has identified no policy or custom attributable to governmental policymakers that caused him to suffer an alleged deprivation of his federal rights. (Dkt. #1.) As for plaintiff's conclusory assertions that the officers' alleged conduct in this case, including the withholding of his firearm as evidence, are indicative of unlawful department custom (dkt. #51 at 6-7), these are not "evidence of a prior pattern of similar constitutional violations" that could create a genuine

dispute of fact. *See Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 234 (7th Cir. 2021) ("it is usually necessary in *Monell* cases to introduce evidence of a prior pattern of similar constitutional violations").

### F. Brandon Christianson and Eric Marten

Deputies Brandon Christianson and Eric Marten are also entitled to summary judgment. Plaintiff contends that these officers lacked probable cause to (a) seize or arrest him, or (b) search his home and seize his gun, holster and ammunition. These allegations implicate the Fourth Amendment, which protects people from "*unreasonable* searches and seizures." U.S. Const. amend. IV (emphasis added). As explained below, plaintiff has failed to advance sufficient evidence for a reasonable jury to find his seizure and arrest was unreasonable, much less that the consensual search of his home and seizure of property was unreasonable.[7]

### A. Seizure and Arrest

Beginning with plaintiff's better-developed claim of unlawful arrest, plaintiff claims that defendants Christianson and Marten lacked probable cause to arrest him. However, a "police officer has probable cause to arrest if, *at the time of the arrest*, the facts and circumstances

---

[7] Plaintiff would also fault Deputies Christianson and Marten for violating his Sixth Amendment right to a speedy trial by taking 18 days to "come up with Trumped up Charges," but they are plainly entitled to summary judgment on this claim as well. (Dkt. #23 at 2.) First, the criminal complaint was filed by a nondefendant prosecutor (dkt. #23-2 at 3), not by either of these law enforcement officers. Second, even if either defendant could somehow be held responsible for the timing or decision to charge, plaintiff does not explain how he was prejudiced by the 18-day period between arrest and the filing of the criminal complaint, except for slightly "slow[ing] down the process of a speedy trial" (dkt. #23), assuming he even asserted the right to a more expeditious charge. *See Barker v. Wingo*, 407 U.S. 514, 528 (1972) (elements of a Sixth Amendment claim include whether criminal defendant asserted his right to a speedy trial and whether he suffered any actual prejudice). Third, plaintiff cites no case holding that an 18-day delay under these circumstances is enough to implicate a possible Sixth Amendment violation.

10

within the officer's knowledge are sufficient to permit a prudent person to believe that the suspect had committed, is committing, or is about to commit an offense." *Rooni v. Biser*, 742 F.3d 737, 740 (7th Cir. 2014) (emphasis added).  Probable cause does *not* require "demonstrating that it is more likely than not that the suspect committed a crime." *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008) (citation omitted).  "So long as the totality of the circumstances, viewed in a common sense manner, reveals a probability or substantial chance of criminal activity on the suspect's part, probable cause exists." *United States v. Parra*, 402 F.3d 752, 764 (7th Cir. 2005) (citation omitted).

Moreover, probable cause is an absolute defense to a § 1983 claim for unlawful arrest. *Id.*; *see also Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017) ("Probable cause acts as an absolute bar to a claim for false arrest.").  "Usually in a § 1983 false-arrest case the jury determines whether the arrest was supported by probable cause; but if the underlying facts are undisputed, the court can make that decision on summary judgment." *Abbott v. Sangamon Cnty.*, 705 F.3d 706, 714 (7th Cir. 2013)

Here, even viewed in the light most favorable to plaintiff, a reasonable jury would have to conclude on this record that defendants had probable cause to arrest plaintiff.  Specifically, under Wis. Stat. § 941.20(1)(b), an individual who "[o]perates or goes armed with a firearm while he or she is under the influence of an intoxicant" is guilty of a misdemeanor, and at the time of arrest, defendants knew:  (1) police had received a call that plaintiff had a gun and was threatening to harm people; (2) plaintiff had been drinking earlier that evening; (3) plaintiff still appeared intoxicated; (4) plaintiff had guns and ammunition in his home; (5) plaintiff admitted to threatening to "put a bullet" in certain individuals from Rome and to "kick their ass"; (6) Mohr and R.H.M. had said that they saw plaintiff with a pistol leaving

his home; *and* (7) plaintiff conceded that Mohr and R.H.M. were likely afraid he was going to kill one of the individuals from Rome if that individual came to plaintiff's home.

Moreover, under Wis. Stat. § 940.235, "[w]however intentionally impedes the normal breathing or circulation of blood by applying pressure on the throat or neck . . . of another person is guilty of a" felony.  At the time of arrest, defendants also knew that:  (1) plaintiff had repeatedly admitted he "slammed," "pushed," or "shoved" Mohr; (2) Mohr and R.H.M. said that plaintiff choked Mohr; and (3) Mohr had described feeling as though she was going to lose consciousness as her eyes were rolling back into her head and her breathing was impaired.  Accordingly, a reasonable jury would have to conclude that defendants reasonably surmised *at the time of plaintiff's arrest* that there was "a substantial chance of criminal activity" on plaintiff's part.  *Parra,* 402 F.3d at 764.

In response to this seemingly compelling evidence of probable cause to arrest, plaintiff primarily focuses on Mohr's credibility and her claim of strangulation.  Specifically, plaintiff argues that defendants should not have found Mohr to be credible, apparently because she has a "history of domestic issues" and a "record of Domestic."  (Dkt. ##23 at 2, 51 at 4.)  However, plaintiff presents no evidence in support of these contentions.  Although plaintiff maintains that police should have looked up Mohr's record that night, plaintiff fails to explain how any of this would or should change the defendants' probable cause analysis leading up to plaintiff's arrest.  If anything, the fact that Mohr had been a victim of past domestic abuse (or even involved in abuse in the past) would make her report of being caught up again in domestic violence *more*, not less, likely.

Plaintiff's other attempts to cast doubt on Mohr's credibility are no more persuasive. For example, plaintiff asserts that Mohr could speak "just fine" on the 911 call (dkt. #51 at

12

5), notes that Mohr had also been drinking, and points out that Christianson did not recall marks on Mohr's neck. However, none of these cherry-picked facts are enough for a reasonable jury to find defendants lacked a sufficient basis to find Mohr's overall story credible, especially when plaintiff himself contemporaneously corroborated many of Mohr's statements *and* made other statements that night that bolstered the officers' probable cause determination, as did R.H.M.'s independent statements. While Mohr's brother now attests that Mohr and R.H.M. had agreed to lie, that information was not only unknown at the time of arrest, but would be inadmissible hearsay if admitted "to prove the truth of the matter asserted" and this case were to move forward. *See* Fed. R. Evid. 801(c) (prohibiting out-of-court statements from being offered "in evidence to prove the truth of the matter asserted in the statement").

At bottom, plaintiff maintains that he is innocent of the charges, but "[t]he Constitution does not guarantee that only the guilty will be arrested." *Baker v. McCollan*, 443 U.S. 137, 145 (1979). The fact that Mohr subsequently recanted, or that the charges were later dismissed, does not speak to whether defendants lacked probable cause to arrest plaintiff on May 1, 2020. *See Qian v. Kautz*, 168 F.3d 949, 953-54 (7th Cir. 1999) ("this is an *ex ante* test: the fact that the officer later discovers additional evidence unknown to her at the time of the arrest is irrelevant to whether probable cause existed at the crucial time"). Defendants are entitled to summary judgment on this claim.

Plaintiff's alternate claim that he was seized before his arrest and probable cause existed is too underdeveloped to proceed further. Indeed, plaintiff's submissions do not even explain what he means by an earlier "seizure," clarify at what point he believes he was seized, or even whether that is a claim separate from his claim of unlawful arrest. (Dkts. ##1, 23,

13

51.) To begin, a seizure occurs when a person submits to an officer's show of authority and his freedom of movement is restrained. *California v. Hodari D.*, 499 U.S. 621, 626-27 (1991). A show of authority exists when an officer's words and actions would lead a reasonable person to believe they were not free to disregard them. *Id.* at 628. Defendants argue that no Fourth Amendment seizure occurred until plaintiff was formally arrested, at least based on a lack of circumstances that would suggest otherwise. *See United States v. Smith*, 794 F.3d 681, 684 (7th Cir. 2015) (unexhaustive list of the circumstances and factors courts consider in assessing whether a seizure has occurred). Defendants persuasively point to the nature of the 911 call as justifying their initial contact with plaintiff, that plaintiff voluntarily came outside and then invited them into his home, where he freely moved about the living room as well as down a hallway. Plus, defendants note that they did not physically touch plaintiff, nor did they use forceful language or tone of voice. To the contrary, the body camera footage establishes beyond doubt that plaintiff was consensually engaging with police throughout the encounter without indication that he did not want to answer questions, much less felt compelled to do so.

In his response, plaintiff does not meaningfully engage with defendants' arguments or caselaw, stating that he cooperated with law enforcement "because of [his] respect for law." (Dkt. #51 at 3.) And while plaintiff describes Christianson's request to meet with plaintiff outside as "coercive" because plaintiff had just woken up, the video evidence again shows Deputy Christianson using a conversational tone, and plaintiff willingly conversing with him in a responsive manner, even volunteering excess information. (Dkt. #48 at 2, Exhibit 1B at 13:19-18:09.)

Finally, after Christianson left to speak with Mohr, plaintiff points to defendants' statement in their brief that Deputy Marten and two other officers later "escorted" plaintiff out of his home as evidence of a "detainment." (Dkt. #51 at 3, 5.) Even if plaintiff was seized or detained at that point, a brief detention is authorized if the officer has reasonable suspicion that an individual is engaged in criminal activity. *Terry v. Ohio*, 392 U.S. 1, 20-21 (1968). Not only is reasonable suspicion a less demanding standard than probable cause, *Matz v. Klotka*, 769 F.3d 517, 522 (7th Cir. 2014), but as discussed above, plaintiff has not established a genuine dispute of material fact concerning that inquiry. Regardless, even before speaking to Mohr and R.H.M., the officers had already heard *plaintiff* admit that he had been drinking, had pushed or shoved his girlfriend, and threatened to harm other individuals that same night, and had guns and ammunition in the home to follow through on his threat to harm those individuals should they show up. Thus, the officers would have been more than justified in not leaving plaintiff alone in his home while they continued their investigation outside. *See United States v. Bailey*, 568 U.S. 186, 193 (2013) (in certain circumstances, police may detain individuals with less than probable cause if the scope is limited and the detention advances an interest in crime prevention and detection or officer safety). Accordingly, defendants are entitled to summary judgment on this claim.

### B. Search and Seizure of the Gun, Holster and Ammunition

As for plaintiff's other claim -- that defendants unlawfully searched his bedroom after his arrest and seized his gun, holster and ammunition -- he has not established a genuine dispute of material fact as to whether defendants had probable cause to believe these items were evidence of a crime. Specifically, defendants knew before searching the back bedroom

and seizing the pistol: (1) the nature of Mohr's call to police; (2) Mohr having heard plaintiff threaten two other individuals in Rome, which Berger himself enthusiastically endorsed; (3) Mohr's report that she then heard plaintiff load a gun and saw him emerge from the back bedroom with a pistol, which he set down in the kitchen while putting on his boots to leave; (4) R.H.M.'s description of plaintiff leaving the house with a specific silver and black pistol after making threats; (5) plaintiff's admission that he had been drinking and would "put a bullet" in the individuals from Rome if they came to his home; and (6) Berger's concession that Mohr and R.H.M. were likely afraid that he would kill those individuals if they came to his home.

While law enforcement seizure of personal property is ordinarily *per se* unreasonable unless accomplished pursuant to a warrant, *United States v. Jackson*, 598 F.3d 340, 346 (7th Cir. 2010), an obvious exception arises when someone validly consents to a search. Moreover, consent may be obtained from a third party who exercises common authority over the property to be searched. *United States v. Matlock*, 415 U.S. 164, 170-71 (1974). Because "the ultimate touchstone of the Fourth Amendment is reasonableness," either actual authority or apparent authority is enough to support third-party consent. *Illinois v. Rodriguez*, 497 U.S. 177, 188-89 (1990). Moreover, actual authority depends on whether "there is mutual use of the property by persons generally having joint access or control for most purposes." *United States v. Ryerson*, 545 F.3d 483, 487 (7th Cir. 2008) (citation omitted). There is no reasonable dispute that defendants had both on the facts here.

Indeed, Mohr had lived with plaintiff in the same home for five years and was his girlfriend at the time of the search; R.H.M. lived with them; and Mohr and R.H.M. both obviously knew where things were in the home. *Id.* at 487-88 (girlfriend had actual authority

16

to consent to search of home she shared with defendant and their infant daughter for ten months before the search, and had access to certain records in the basement). Moreover, Mohr told Deputy Christianson that "we can go look" when asked whether she could access Berger's gun, then walked to the back of the house with the officers and R.H.M. *See United States v. Villegas*, 388 F.3d 317, 324-25 (7th Cir. 2004) (consent can be verbal or nonverbal).

Once inside the house, Mohr also freely moved about, indicating where plaintiff had set the gun in the kitchen, then following her son and the officers to the back bedroom and remaining there without objection while Deputy Christianson retrieved the gun, along with a holster and two clips. Plaintiff suggests *no* reason why defendants should have questioned whether Mohr's mutual use of the home included the back bedroom, nor can the court think of any. *See Ryerson*, 545 F.3d at 489 (explaining that apparent authority to consent exist "when the facts available to an officer at the time of a search would allow a person of reasonable caution to believe that the consenting party had authority over the premises") (citation omitted).

In the end, plaintiff does not argue that Mohr lacked the authority to consent, nor that her consent was involuntary or coerced; rather, plaintiff argues that Mohr never gave her consent as evidenced by her subsequent recantation. (Dkt. #51 at 4-5.) Again, however, a later recantation does not change the information unfolding in real time before the officers on May 1, 2020. Plaintiff's claim that Deputy Christianson "failed to get consent from [Mohr]" to allow R.H.M. to locate the firearm is also of no moment. (*Id.* at 4.) Mohr reentered the house *with* police and her son, *and* she was in the bedroom with R.H.M. while Christianson retrieved the gun, holster, and ammunition. Plaintiff is unable to specify when Mohr gave any indication either to R.H.M. or to police to stay out of the bedroom, otherwise

17

stop the search or not to seize the subject pistol. Accordingly. defendants are entitled to summary judgment on this claim as well.

ORDER

IT IS ORDERED that:

1) Defendants' motion for summary judgment (dkt. #39) is GRANTED and plaintiff's motion for summary judgment (dkt. #23) is DENIED.

2) The clerk of court is directed to enter judgment in favor of defendants and close this case.

Entered this 11th day of August, 2022.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge